

AO 91 (Rev. 02/09) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the
District of Oregon

FILED'10 APR 16 9 34 USDC-ORP

UNDER
SEAL

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.   '10-MJ-425 |
| DARRYL KEVIN BELK | ) | |
| | ) | |
| _____ | ) | |
| *Defendant* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of   04/08/2010   in the county of   MULTNOMAH   in the   _____ District of
__Oregon__   , the defendant violated   __18__   U. S. C. §   __373__   _____
, an offense described as follows:

Defendant, with intent that another person engage in conduct constituting a felony, to wit: a violation of 18 USC § 2261 Interstate Domestic Violence, that has as an element the use, attempted use, or threatened use of physical force against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors to persuade such other person, to wit, an individual identified as "Matt," a law-enforcement official working in an undercover capacity to engage in such conduct, to wit, the attempted use or threatened use of physical force against the person of another;

This criminal complaint is based on these facts:

See attached affidavit by Special Agent Phil R. Slinkard, incorporated herein.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Phil R. Slinkard
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  April 16, 2010

_____
*Judge's signature*

City and state:                Portland, Oregon

Honorable Janice M.Stewart, U.S. Magistrate Judge
*Printed name and title*

| IN THE STATE OF OREGON | ) | AFFIDAVIT OF |
| | ) .ss | PHIL R. SLINKARD |
| COUNTY OF MULTNOMAH | ) | ARREST WARRANT |

I, Phil R. Slinkard, being first duly sworn say:

      1.     I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI) and have been so employed since May 19, 2002. I am currently assigned to the Portland Division of the FBI, Cyber Crime Squad, where I investigate computer crimes. I have received extensive training in the investigation of computer, telecommunications, and other technology crimes. I have a Masters Degree in the Management of Computer Resources and Information Systems from Webster University in Saint Louis, Missouri. Prior to my employment with the FBI, I was a consultant for a global high-tech software company where I gained expertise in networking, web technologies, and programming in several different computer languages. I am a Global Information Assurance Certification (GIAC) Certified Incident Handler (GCIH). I have received additional training at the FBI Academy and through Sytex in investigative techniques of computer crimes and online covert operations.

      2.     Since October 2002, I have been a member of the Portland FBI's Cyber Crime squad. I have been involved in the investigation of matters involving criminal intrusions of computer systems by foreign and domestic sources as it relates to violations of Title 18, United States Code, §§ 1029, 1030 and 1341. Additionally, I have also investigated trafficking in counterfeit goods and services in violation of Title 18, United States Code, § 2320, criminal infringement of a copyright in violation of Title 18 United States Code, § 2319, and the possession, receipt, reproduction and transmission of child pornography over the Internet, in

Page - 1 - Affidavit of Phil R. Slinkard - ARREST WARRANT

violation of Title 18, United States Code, §§ 2252 and 2252A. I have also conducted searches

pertaining to these types of investigations.

        3.      The facts set forth in this affidavit are based on the following: my own personal

knowledge; knowledge obtained from other individuals during my participation in this

investigation, including other law enforcement officers; interviews of witnesses; my review of

records related to this investigation; communications with others who have knowledge of the

events and circumstances described herein; and information gained through my training and

experience.  Because this affidavit is submitted for the limited purpose of providing probable

cause in support of a complaint and a warrant for the arrest of Darryl Belk,  it does not set forth

each and every fact that I or others have learned during the course of this investigation.

## Applicable Law

        4.      United States Code, Title 18, Section 1958, Use of interstate commerce facilities

in the commission of murder-for-hire provides:

> Whoever travels in or causes another (including the intended victim) to travel in
> interstate or foreign commerce, or uses or causes another (including the intended
> victim) to use the mail or any facility of interstate or foreign commerce, with
> intent that a murder be committed in violation of the laws of and State or United
> States as consideration for the receipt of, or as consideration for a promise or
> agreement to pay, anything of pecuniary value, or who conspires to do so, shall be
> fined under this title or imprisoned for not more than ten years, or both.

The phrase, "anything of pecuniary value" means anything of value in the form of money, a

negotiable instrument, a commercial interest, or anything else the primary significance of which

is economic advantage; "facility of interstate commerce" includes means of transportation and

communication.

        Title 18, United States Code, § 1512 Tampering with a witness, victim, or an informant

Page - 2 - Affidavit of Phil R. Slinkard - ARREST WARRANT

provides in relevant part:

(a)

(1) Whoever kills or attempts to kill another person, with intent to—

(A) prevent the attendance or testimony of any person in an official proceeding;
***

shall be punished as provided in paragraph (3).

(2) Whoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to—

(A) influence, delay, or prevent the testimony of any person in an official proceeding;

(B) cause or induce any person to—

(i) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
***

(iv) be absent from an official proceeding to which that person has been summoned by legal process;
***

shall be punished as provided in paragraph (3).

(3) The punishment for an offense under this subsection is—

(A) in the case of a killing, the punishment provided in sections 1111 and 1112;

(B) in the case of—

(i) an attempt to murder; or

(ii) the use or attempted use of physical force against any person;
imprisonment for not more than 30 years; and

(C) in the case of the threat of use of physical force against any person,
imprisonment for not more than 20 years.

(b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

(1) influence, delay, or prevent the testimony of any person in an official proceeding;

(2) cause or induce any person to—
***

(D) be absent from an official proceeding to which such person has been summoned by legal process;
***

shall be fined under this title or imprisoned not more than 20 years, or both.

(c) Whoever corruptly—
***

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.


Page - 3 - Affidavit of Phil R. Slinkard - ARREST WARRANT

(d) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—

(1) attending or testifying in an official proceeding;

(2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation [1] supervised release,,[1] parole, or release pending judicial proceedings;

(3) arresting or seeking the arrest of another person in connection with a Federal offense; or

(4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding;

or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.

\*\*\*

(g) In a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance—

(1) that the official proceeding before a judge, court, magistrate judge, grand jury, or government agency is before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a Federal grand jury, or a Federal Government agency; or

(2) that the judge is a judge of the United States or that the law enforcement officer is an officer or employee of the Federal Government or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant.

§ 2261 Interstate domestic violence provides in relevant part:

(a) Offenses.—

(1) Travel or conduct of offender.— A person who travels in interstate or foreign commerce or enters or leaves Indian country or within the special maritime and territorial jurisdiction of the United States with the intent to kill, injure, harass, or intimidate a spouse, intimate partner, or dating partner, and who, in the course of or as a result of such travel, commits or attempts to commit a crime of violence against that spouse, intimate partner, or dating partner, shall be punished as provided in subsection (b).

18 USC 373 - Solicitation to commit a crime of violence provides:

(a) Whoever, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors to persuade such other

person to engage in such conduct, shall be imprisoned not more than one-half the maximum term of imprisonment or (notwithstanding section 3571) fined not more than one-half of the maximum fine prescribed for the punishment of the crime solicited, or both; or if the crime solicited is punishable by life imprisonment or death, shall be imprisoned for not more than twenty years.

(b) It is an affirmative defense to a prosecution under this section that, under circumstances manifesting a voluntary and complete renunciation of his criminal intent, the defendant prevented the commission of the crime solicited. A renunciation is not voluntary and complete if it is motivated in whole or in part by a decision to postpone the commission of the crime until another time or to substitute another victim or another but similar objective. If the defendant raises the affirmative defense at trial, the defendant has the burden of proving the defense by a preponderance of the evidence.

(c) It is not a defense to a prosecution under this section that the person solicited could not be convicted of the crime because he lacked the state of mind required for its commission, because he was incompetent or irresponsible, or because he is immune from prosecution or is not subject to prosecution.

### Statement of Probable Cause

5.      Timothy Nebergall, who is currently under indictment in the United States District Court, District of Oregon, for violations of Title 18 § 1030, fraud and related activity in connection with computers,  initially related information from a telephone conversation he had with Darryl Belk.  Nebergall related this information through his attorney, Federal Public Defender Alison Clark.

6.      On April 7, 2010, Nebergall related the details of a conversation between himself and Belk to SA Justin Jacobs.  The original conversation between Nebergall and Belk occurred on March 31, 2010.  Darryl Belk, who resides in Vancouver, Washington, contacted Timothy Nebergall, who resides in Modesto, California, via telephone.  During this conversation, Belk, abruptly asked Nebergall if he knew anyone who could "send a permanent message to someone."

Nebergall related to SA Jacobs that he had gotten to know Belk very well over the years. Nebergall believed Belk was referring to killing or causing serious injury to someone. Nebergall stated said he was caught off guard by Belk's comments and jokingly replied "so your looking for a delivery service." Belk's reply was something to the effect of "exactly, I need a permanent delivery service." Nebergall said Belk's tone of voice was serious. Nebergall told Belk that he "had someone in mind" and he (Nebergall) would have that person contact Belk. Nebergall told Belk his contact would say the person is from "the delivery service Tim sent."

7.     On April 7, 2010 and under the direction of the SA Jacobs, Nebergall attempted contact to Belk via telephone at 360-448-7158. This call went to Belk's voice mail. Nebergall then contacted Belk via telephone at 360-771-9042. Belk answered the call. During this conversation, Nebergall told Belk he had found the person for the delivery service and they would be contacting him soon. Belk replied "that sounds fantastic".

8.     An agent of the FBI, assigned to the Los Angeles office and certified as an Undercover Agent (referred to as UCA), contacted Belk via telephone at 360-771-9042 on April 7, 2010. During this conversation, the UCA told Belk he was the "delivery service Tim sent". Belk stated he wanted a "full service" delivery. The UCA and Belk then made arrangements for Belk and the UCA to meet in the Portland Metro Area. The UCA told Belk he was in the Los Angeles area and would have to fly to Portland. The UCA would contact Belk once he arrived in Portland the next day.

9.     On April 8, 2010, the UCA contacted Belk via telephone at 360-771-9042. The UCA arranged for Belk to meet him at the Holiday Inn located in Portland, Oregon, stating that he had flown from Los Angeles, California. At approximately 8:42 p.m., Belk arrived at the

Page - 6 - Affidavit of Phil R. Slinkard - ARREST WARRANT

hotel and stated he had driven from Vancouver, Washington.    I witnessed this meeting through audio and visual monitoring equipment placed in the room prior to the meeting.    This meeting was recorded.    Belk engaged the UCA in a conversation about his relationship with a former girl friend hereinafter referred to as "Jane".    Belk described an incident on December 21, 2009 where he was charged with domestic violence against Jane.    Belk alleged Jane had cut him on the face with the back of a hammer.    Belk then walked outside of the residence and called police.    Belk claimed between the time he had walked outside and the time police arrived, Jane had hit herself in the face with a hammer in order to get him in trouble.    Belk was arrested and charged with "Assault in the Fourth Degree - DV" in Clark County Washington based on this incident.    Belk felt these charges were unfair since he did not actually hit Jane.

10.    Belk doesn't think companies will hire him if he has a criminal record containing violence.    Belk believes he still has a future: he is only forty-two (42) and still has a good future, unless these charges stick.    Jane, on the other hand, does not regularly work.    Belk also mentioned that Jane is on disability and receives approximately $1800.00 per month from the military.    This is another reason Belk believes Jane does not want to work and had no real future.    Belk believes he is making something of his life and Jane never will.

11.    The last time Belk and Jane went to court, Belk stated that Jane concocted a story that represented Belk as being down in the dumps and emotionally distraught.    Then Jane claimed Belk had tried to contact her and that he really needed to see her.    Finally, Jane claimed Belk's mood had shifted and told her that he was going to get away with hitting her twice now.    This story was told in court.    Belk stated this situation was "the sealer of the deal" because Jane was lying in court.    Belk believed Jane's plan was to get him locked up in jail until his court date

Page - 7 - Affidavit of Phil R. Slinkard - ARREST WARRANT

in order make Belk take a plea deal.

12.     Belk told the UCA that his decision to seek "full service delivery" was very deliberate and he had weighed his decision for over a month.  Belk had decided to take action to stop Jane from ruining his life.  But, Belk explained to the UCA, he was essentially powerless at this point to be able to solve his problem because he was not supposed to contact her, couldn't record conversations with her, and did not want to directly get involved with her.  At one point, he stated that he knew that he could go to jail if he contacted her and that Jane was trying to get him to do so in order to cause him to be placed in custody  (I have reviewed police reports provided by the Clark County District Attorney's office and note that Belk makes reference to a temporary restraining order.  The reports also note a protective order in effect since Belk's arrest on December 21, 2009).

13.     Initially, Belk stated "full service delivery" meant that he wanted the UCA to place evidence, in the form of a gun and heroin, into Jane's car.  Once this was completed, an anonymous call could be placed to the police and Jane would be arrested.  Belk believed this would "shake her credibility" and help him defeat the domestic violence charges.  Belk stated that initially this is what he intended.  Belk also provided the UCA with several photographs of Jane, a photograph of Jane's car, and several details of her schedule.  Belk stated he got the photographs from her Facebook account and some came from his Facebook account.  I viewed these printouts and noted they appeared to be created on a computer, and based on my training and experience, I know that Face book is an Internet based social networking site that sometimes displays photographs or images of the user and may be open to the public.

14.     The conversation between Belk and the UCA progressed to the point where Belk

Page - 8 - Affidavit of Phil R. Slinkard - ARREST WARRANT

made known his desire to have Jane killed. Belk believed that having Jane "taken out" would not be a good option for him because he would be the first person suspected since he has the no contact order (which Belk repeatedly refers to as an "anti-harassment" order), and the prior relationship. Belk then wanted to go into the subject of killing Jane deeper with the UCA. Belk stated that "maybe I am not thinking about this the right way." Belk describes how he believes Jane is trying to destroy his life. Belk believes Jane may be pregnant with his child, but does not think he will ever see his child because the domestic violence charge will be on his record and he will be labeled as an abuser. Belk believes he would be the best person to raise the child since Jane does not take care of the children she has. Belk again re-iterates how all these charges relating to domestic violence are false. Belk believes this situation is not reasonable and he must take action to rectify the situation. Belk stated that "I just want my life back really. Yeah. Whatever it takes, that is what I want. Whatever it takes, that is what I want. You know. I don't care what it takes. Whatever it takes, that is what I want." Belk feels that he has no options and the court case will go forward. Belk's stated that his decision to take this action was a very deliberate decision. Belk stated "To save my life, I am looking to change someone else's. I did not take that lightly... I have thought about everything, like. I am going to have to live with this. And you know, I've got to be completely honest with you. I don't have those conscious issues." The UCA asked Belk to clarify what conscious issues he was talking about. Belk replied "With whatever happens. I really don't. This person right here that I hate more than anybody I have ever met in my entire life." The UCA asked Belk what the "range of things" Belk was talking about. Belk stated "ideally, if she could be taken out and that wouldn't cause a problem for me..." Belk was again concerned that"taking out" Jane would come back on him.

Page - 9 - Affidavit of Phil R. Slinkard - ARREST WARRANT

15.    Belk and the UCA discussed if there was a way an accident could happen to Jane and it not tie back to Belk, Belk would want this to accident to happen to Jane. Belk stated "the two thoughts I did have is that, from the week of the 19th to the 22nd, I am going to Anaheim. I will be in Disneyland. I am gone. You know, out of town. Great timing." Belk further clarified this would be a great time for Jane to disappear because Belk could not be tied to anything in Portland. Belk also mentioned May 1st through May 5th. Belk called the April 19th to the 23rd an "ideal window" in reference to the accident to Jane happening. The UCA and Belk discussed how Belk's trip would be with other people and would provide an alibi. Belk stated "that's the beauty of this". There will be two other adults and three children on the trip. On April 15, 2010, I was present for a discussion involving the assigned Clark County, Washington prosecutor on Mr. Belk's current domestic assault charges when we learned that Belk was cited to appear for a readiness hearing on April 20, 2010, in the middle of his "vacation" and that his trial was scheduled to begin on April 30.

16.    Belk stated "I don't ever want to see her face or be around her again in life. If I saw her in the afterlife, it would be way too soon... " Belk then states "I can honsetly say I hate this person. I wish this they where dead. I hate this person. I wish this person would disappear from the face of the earth." Belk affirms his desires with the statement "Go for the gusto, the full service delivery. I want her out. I want her gone." The UCA clarified that Belk wanted her dead. Belk agreed that was his intent.

17.    Belk wanted Jane killed during the time he was gone. Belk provided the UCA with details on Jane' schedule and how the murder could happen. Belk and the UCA agreed on a price of $8000.00 for Jane's murder. The UCA requested $4000 up front and the balance would

be due upon completion of the murder. The UCA also requested $500 to cover his expenses. Belk paid the UCA $500 in cash. The UCA and Belk agreed on further contact happening the following week. Belk provided his email address of dbelkk@gmail.com as a possible method of further contact.

18. Following the termination of the meeting, agents of the FBI followed him back to an apartment complex located in North Morrison Road, in Vancouver, Washington. Agents were unable to determine the specific residence because of the configuration of the apartment complex and have no further information. Police reports provided by the Clark County District Attorney's Office that pertain to Belk's pending charges gives an address of 2600 T street, # 37, in Vancouver, Wa. The last address provided in the report material appears to be the address shared by Belk and Jane. Belk is identified in those police reports as Darryl Kevin Belk, a DOB of 4/26/1967, and who is approximately 5'11" weighing 200 lbs with Brown eyes. I know that Belk is a lightly complected African American. Efforts to locate him by contacting utility companies providing service to rhe Vancouver residential area, United States Postal Service and other methods have not provided any investigative leads into the whereabouts of Belk.

## Conclusion

19. Based on the foregoing, I have probable cause to believe and do believe that a violation of 18 U.S.C. §§ 1958 (use of Interstate Commerce facilities in the Commission of Murder for Hire), 1512 (Witness Tampering, predicated on proceedings associated with a violation of 18 U.S.C. § 2261, prohibiting travel in interstate commerce with the intent to violate a stalking or protective order) and 373 (Solicitation to Commit a Crime of Violence) have occurred and respectfully request that a warrant issue authorizing the arrest of Darryl Kevin Belk.

20.    This affidavit, the accompanying application, and the requested warrant were reviewed by Assistant United States Attorney Greg Nyhus who advised me that the affidavit as reviewed was sufficient for presentation.

Phil R. Slinkard
Special Agent

Subscribed to before me this *16* of *April*, 20*10*

Janice M. Stewart
United States Magistrate Judge

Page - 12 - Affidavit of Phil R. Slinkard - ARREST WARRANT